**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

**WINSTON WADE,**                                    Case No. 3:18 CV 1978

        Plaintiff,

        v.                                    Magistrate Judge James R. Knepp II

**CITY OF TOLEDO,**

        Defendant.                    MEMORANDUM OPINION AND ORDER

## INTRODUCTION

In July 2018, Plaintiff Winston Wade filed an employment discrimination complaint in the Lucas County Court of Common Pleas. (Doc. 1-1). Defendant City of Toledo removed the case to this Court the following month. (Doc. 1). This Court has jurisdiction under 28 U.S.C. § 1331. Currently pending before the Court is Defendant's Motion for Summary Judgment (Doc. 17), which Plaintiff has opposed (Doc. 20), and to which Defendant has replied (Doc. 23). For the reasons discussed below, Defendant's Motion is GRANTED.

## BACKGROUND

Plaintiff's amended complaint alleges claims based on two different times he lost his job with Defendant – one in 2014 (and the events that followed) and one in 2017. Viewing the facts in the light most favorable to Plaintiff, the background of this case is as follows:

2014 Layoff

Plaintiff, who is African-American, was originally hired by the City of Toledo in March 2012 as an Administrative Technician I, an exempt position. (Andrea Seiple Affidavit, Doc. 17-2, at 2); (Plaintiff Affidavit, Doc. 20-1, at 1); (Kelly Murphy Affidavit, Doc. 23-3, at 1). He was

laid off in early 2014 and told it was due to politics. (Plaintiff Deposition, Doc. 17-1, at 12-13); (Plaintiff Aff., Doc. 20-1, at 1). Plaintiff testified that "race definitely played a factor to an extent" in his layoff and "politics definitely played a factor." (Plaintiff Dep., Doc. 17-1, at 10); see also *id.* (noting that over time he "felt it had to do with . . . race."). Ryan Crock[1], a Caucasian intern who worked with Plaintiff, was eventually hired as a full time-employee and not let go. *Id.* at 49-50. Plaintiff testified Crock "was asked to work with the department of development to assist" and that he and Plaintiff did the same work ("You know, I done what he was doing."). *Id.* at 49. He took Plaintiff's position and responsibilities even though Plaintiff had a college degree and Crock did not. *Id.* at 50; (Plaintiff Aff., Doc. 20-1, at 1) ("The Collins administration continued the employment of a white intern, without a college degree and less experience to maintain my position within the department of development, later placing him on salary payroll."). Victoria Coleman, Manager of Administrative Services in the Department of Human Resources at the City, states that Crock was hired as a Mayor's Assistant I in the Department of Business Development, an unclassified exempt position and that although Plaintiff and Crock both worked in that department, at no time did they hold the same position. (Coleman Aff., Doc. 23-2, at 2). She also states Crock "did not assume the position of Administrative Technician I after [Plaintiff] was laid off in 2014." *Id.*

After his termination, Plaintiff added his name to the recall list for future positions for which he met the qualifications. (Seiple Aff., Doc. 17-2, at 2); (Plaintiff Aff., Doc. 20-1, at 1). Plaintiff was thus eligible to be hired from the recall list for positions in his same classification

---

1. Mr. Crock's name is alternately spelled "Ryan Crock" and "Ryne Krock." *Compare* Doc. 20, at 5, *with* Doc. 23-2, at 2. The undersigned uses the spelling advanced by Plaintiff, but there is no dispute the parties are referring to the same individual.

pursuant to Toledo Municipal Code § 2101.28(g). (Seiple Aff., Doc. 17-2, at 2); (Murphy Aff., Doc. 23-2, at 2).

In early 2014, Plaintiff was contacted by someone in the Department of Finance stating there was a vacancy. (Plaintiff Aff., Doc. 20-1, at 2). He was later told "that acting Director George Sarantou did not approve of hire". *Id.*

In September 2014, the Human Resources Department contacted Plaintiff regarding recall to the position of Administrative Technician I in the Division of Accounts. *Id.*; *see also* Doc. 20-4 (email). The following day he "accepted the position and again the offer was reneged without explanation." (Plaintiff Aff., Doc. 20-1, at 2).

In January 2015, Plaintiff applied for two positions – "Administrative Specialist 1 & 3". *Id.* He was offered the Administrative Specialist 1 position, but it "was later reneged." *Id.*

Plaintiff asserts that between April 2014 and January 2016, he applied for a total of six positions but was not hired. *Id.* He applied for a Secretary 2 position at one point, but did not pass the typing test and was told that was why he was not hired. (Plaintiff Dep., Doc. 17-1, at 14). Plaintiff had "filled in that position as a[n] . . . administrative technician before[.]" *Id.* at 15.

Murphy states that Plaintiff was informed of "three . . . recall positions under the Classified exempt status, of which two he was qualified[.]" (Murphy Aff., Doc. 23-3, at 2). She states the Administrative Technician I position "ultimately went unfilled by the City of Toledo" and the Clerk I position "[w]as filled by another qualified candidate." *Id.*

In March 2016, Plaintiff filed a discrimination claim against the City with the United States Equal Employment Opportunity Commission ("EEOC"). (Doc. 17-4). The EEOC closed the case in August 2018, adopting the findings of the OCRC. (Doc. 17-5).

<u>2017 Termination</u>

In September 2016, Plaintiff was hired by the City as a Clerk Specialist II of Engage Toledo in the Division of Public Utilities. (Plaintiff Aff., Doc. 20-1, at 2); (Seiple Aff., Doc. 17-2, at 2). In this job, Plaintiff was a Civil Service employee, subject to the Collective Bargaining Agreement between AFSCME Ohio Council 8, Local 7 and the City (hereinafter "CBA"). (Seiple Aff., Doc. 17-2, at 2); (Murphy Aff., Doc. 23-2, at 2). Under the CBA, Plaintiff was required to complete a probationary period of 1500 actual work hours. (Seiple Aff., Doc. 17-1, at 2); (Murphy Aff., Doc. 23-3, at 3); Doc. 17-9 (CBA § 2117.34).

In December 2016, Plaintiff was served with a letter from Abby Arnold, Commissioner, Utilities Administration, stating he had been tardy four times in the previous three months. (Doc. 17-11); *see also* Doc. 17-3 (Affidavit of Jenny Gogol, Customer Service Manager). The letter informed Plaintiff that "after consulting with [the union president] and the Human Resources Department, it has been mutually agreed upon to extend your probationary period for an additional 520 hours (for a total of 2020 probationary hours)." (Doc. 17-11). Plaintiff refused to sign. *See id.*; *see also* Gogol Aff., at 2.

On June 29, 2017, Plaintiff was served with a notification regarding sick time usage. (Doc. 17-12). It noted Plaintiff had used 40 hours of non-FMLA or undocumented sick time that year, and advised that "any further use of non-FMLA or undocumented sick leave may subject you to the progressive disciplinary procedure specified in the bargaining agreement." *Id.*

On July 13, 2017, Plaintiff was served with a written Last Chance Agreement from Commissioner Arnold. (Doc. 17-13). Therein it noted that as of July 6, 2017, Plaintiff had 48 undocumented sick hours; it also stated that Plaintiff was "not following the Engage Toledo work rules by calling off at least 30 minutes before the start of [his] shift". *Id.* It stated that

according to the Last Chance Agreement if he was "found guilty of any infraction, minor or major" before the end of the probationary period, his employment would be terminated. *Id.* Plaintiff had a union employee in attendance at this meeting. (Plaintiff Dep., Doc. 17-1, at 35). He refused to sign. (Doc. 17-13); (Gogol Aff., Doc. 17-3, at 2).

On July 21, 2017, Plaintiff was served another letter from Commissioner Arnold repeating the undocumented sick time allegations, and that on two occasions he had not followed work rules requiring him to call off at least 30 minutes prior to the beginning of his shift. (Doc. 17-14). It stated that "[t]he Division believes your attendance record illustrates a lack of motivation to follow the Utilities Administration Rules and Regulations." *Id.* It further noted that Plaintiff had placed three personal calls on July 13, 2017 during work hours and "[w]hen confronted by [his] Supervisor", he "gave two conflicting statements", which, it alleged, "demonstrate[d] dishonesty to your Supervisor and a lack of trustworthiness." *Id.* The letter noted that all of these behaviors occurred during a probationary period. *Id.* The letter informed Plaintiff that failure to sign the Last Chance Agreement would "result in immediate termination of [his] employment from the City of Toledo." *Id.* Plaintiff's request for a union witness was denied, as was his request for a meeting with the acting Commissioner. (Plaintiff Aff., Doc. 20-1, at 2). He "expressed an[] intent to sign last chance agreement" and asked for clarifications both verbally and in writing, but was told he had to sign the agreement or be terminated. *Id.* Plaintiff refused to sign the agreement and was terminated. (Gogol Aff., Doc. 17-3, at 2); (Plaintiff Dep., Doc. 17-1, at 32).

In October 2017, Plaintiff filed a complaint with the Ohio Civil Rights Commission ("OCRC"). (Doc. 17-6). In June 2018, the OCRC found no probable cause and dismissed the complaint. (Doc. 17-7).

Pursuant to Federal Civil Rule 56(c), summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." When considering a motion for summary judgment, the Court must draw all inferences from the record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, the Court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The moving party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). This burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* Further, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. *See* Fed. R. Civ. P. 56(c)(3) (noting that the court "need consider only the cited materials").

## DISCUSSION

Plaintiff's First Amended Complaint alleges racial discrimination in violation of Ohio Revised Code §§ 4112.02(A) and 4112.99, retaliation in violation of Ohio Revised Code § 4112.02(I), and due process and equal protection violations under 42 U.S.C. § 1983. The undersigned addresses each in turn.

<u>Due Process under 42 U.S.C. § 1983</u>

In his First Amended Complaint, Plaintiff asserted that he had a property interest in his job "by virtue of the fact that he was an employee under a collective bargaining agreement, or in

the alternative, was not a probationary employee because his union dues were deducted in his first pay, he was represented by the union during the extension of his probationary period, and because he was elected as a union steward." (Doc. 12, at 7). He further asserted that he had a "liberty interest in his good name". *Id.* Defendant moves for summary judgment on Plaintiff's § 1983 due process claim, asserting that Plaintiff has not shown deprivation of a liberty or property interest. (Doc. 17, at 4-6). In his Memorandum in Opposition, Plaintiff presents no direct response to this argument. *See* Doc. 20.

The Fourteenth Amendment to the United States Constitution provides that no state "shall deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV § 1. When considering a procedural due process claim, a court first asks whether a state actor has interfered with a life, liberty, or property interest of the plaintiff and, if so, whether the procedures attendant upon that deprivation were constitutionally sufficient. *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 459-60 (1989) (citing *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 571 (1972) and *Hewitt v. Helms*, 459 U.S. 460, 472 (1983)). Thus, this Court must first consider whether Plaintiff had a property interest in his continued employment. *Curby v. Archon*, 216 F.3d 549, 553 (6th Cir. 2000).

A property interest is created, and its dimensions defined, "by existing rules or understandings that stem from an independent source such as state law." *Roth*, 408 U.S. at 577; *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985); *Curby*, 216 F.3d at 553. While civil service employees in positions that can only be terminated "for cause" have a property interest in their jobs, "probationary employees do not have this interest under Ohio law." *Moore v. City of Cleveland*, 388 F. Supp. 3d 908, 914-15 (N.D. Ohio 2019); *see also Fletcher v. Ohio Dept. of Transp.*, 2012 WL 3673989, at *3 (Ohio Ct. App.) ("It is well settled

that probationary civil service employees have no property interest in continued employment sufficient to warrant due process protection."); *State ex rel. Rose v. Ohio Dept. of Rehab. & Corr.*, 91 Ohio St. 3d 453, 457 (2001) ("As a probationary civil service employee, Rose had no property interest in continued employment sufficient to warrant procedural due process protection because her appointment was not final until she satisfactorily completed her probationary period.").

As best the undersigned can discern from Plaintiff's opposition, Plaintiff asserts he had a property interest in his *second* job with the City because he was credited with sick time for prior service, union dues were collected from his first pay check in his new position, he received union representation, and he was elected union steward in 2017. (Doc. 20, at 34). Plaintiff, however, presents no evidence to counter Defendant's evidence that he was terminated while in a probationary status, and presents no statutory or case support to demonstrate the cited actions created a property interest in his employment. Indeed, as Defendant points out in response, the CBA acknowledges that union dues shall be collected during the probationary period, demonstrating that the two things are not mutually exclusive. *See* Doc. 17-9 (CBA § 2117.34).

In his First Amended Complaint, Plaintiff also asserts that "Defendant has a custom and practice and policy [of] eliminating positions of employees without reason or cause or recourse by denying them pre deprivation and post deprivation due process for the discharged employee to contest its decisions." (Doc. 12, at 6). But Plaintiff has no evidence to support such a claim. In his deposition, he acknowledged as much:

> Q  * * * So then my next question is do you have information relating to that as far as can you prove that there's a custom? Is there a situation or information that you were given that this is a custom and practice of the City of Toledo?

A     I can't give you any specific, but the Toledo Blade shows articles where there seemed to play issues with the City.

(Doc. 17-1, at 43). Again, Plaintiff's memorandum in opposition provides no specific argument regarding his due process claim. As noted above, it is a plaintiff's duty to point to the evidence that supports his claim and demonstrates a genuine issue of material fact. *See* Fed R. Civ. P. 56(c)(3) (noting that the court "need consider only the cited materials"). He has not done so, and thus summary judgment will be granted to Defendant on Plaintiff's due process claim.

Racial Discrimination Under Title VII, 42 U.S.C. § 1983 and Ohio State Law

Plaintiff next asserts racial discrimination under Title VII, 42 U.S.C. § 1983 and the Ohio Civil Rights Act. *See* Doc. 12, at 2-5. He contends he was subject to discrimination in his 2014 layoff, in Defendant's failure to re-hire him to certain positions, and in his 2017 termination. *Id.* Defendant asserts Plaintiff has not demonstrated a genuine issue of material fact as to any of these claims.

The Court analyzes racial discrimination claims through the same lens, regardless of whether brought under Title VII, § 1983, or the Ohio Civil Rights Act. The "Ohio Civil Rights Act mirrors Title VII in all relevant respects for Plaintiff's discrimination and retaliation claims." *Lindsey v. Whirlpool Corp.*, 295 F. App'x 758, 760 (6th Cir. 2008). Thus, the Court analyzes these "claims exclusively under a Title VII analysis, with the understanding that [the] success or failure in establishing a right to relief under Title VII necessarily would entail the conclusion that [the] claims must either succeed or fail under Ohio law as well." *Id.* (citations omitted); *see also Russell v. Univ. of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008) (Title VII and O.R.C. § 4112 racial discrimination claims can be analyzed together because "Ohio's requirements are the same as under federal law.") (citing *Carter v. Univ. of Toledo*, 349 F.3d 269, 272 (6th Cir. 2003)). The same is true for § 1983 equal protection claims of racial

discrimination in employment. *See Boxill v. O'Grady*, 935 F.3d 510, 520 (6th Cir. 2019) ("We review § 1983 discrimination claims brought under the Equal Protection Clause using the same test applied under Title VII.") (citing *Deleon v. Kalamazoo Cty. Rd. Comm'n*, 739 F.3d 914, 917-18 (6th Cir. 2014)); *see also Watson v. City of Cleveland*, 202 F. App'x 844, 856 (6th Cir. 2006) ("[Plaintiff] can no better make the evidentiary showings required for *McDonnell Douglas* for the purposes of this [§ 1983] claim than she could for her Title VII claim.").

In its Motion for Summary Judgment, Defendant asserts that it did not discriminate because "[t]he race of Plaintiff is irrelevant to these claims because each result was based on nondiscriminatory reasons." (Doc. 17, at 8).

*2014 Layoff*

Plaintiff clearly identifies one individual he asserts was similarly situated and replaced him – Ryan Crock. He asserts that Crock was "a Caucasian intern . . . who was put in Plaintiff's position and hired one year later" and that Crock "according to Plaintiff, did not have a degree while Plaintiff held a bachelor's degree." (Doc. 20, at 5). In Reply, Defendant contends Crock was not similarly situated because he held a different position than Plaintiff, and did not replace Plaintiff upon his layoff. (Doc. 23, at 4-5). Defendant thus contends Plaintiff cannot establish his initial burden to establish a prima facie case as to his 2014 layoff. *Id.*

Title VII expressly prohibits employers from treating employees differently according to their race. *See* 42 U.S.C. § 2000e–2(a)(1). For Title VII claims based on circumstantial (rather than direct) evidence of racial discrimination, the Court employs the familiar burden-shifting analysis established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) (and later modified by *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981)). This starts with focus on Plaintiff, who carries the initial burden to establish a prima facie case. To

demonstrate a prima facie case, the plaintiff must show that "(1) he or she was a member of a protected class; (2) he or she suffered an adverse employment action; (3) he or she was qualified for the position; and (4) he or she was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 706 (6th Cir. 2006) (internal quotation and citation omitted). If the plaintiff can establish "by the preponderance of the evidence a prima facie case," "the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason'" for the adverse action. *Burdine*, 450 U.S. at 252–53 (quoting *McDonnell Douglas Corp.*, 411 U.S. at 802). If the defendant can do so, the burden shifts back to the plaintiff to "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id.* at 253. "On a motion for summary judgment, a district court considers whether there is sufficient evidence to create a genuine dispute at each stage of the *McDonnell Douglas* inquiry." *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000). To survive summary judgment, a plaintiff need only produce enough evidence to support a prima facie case and to rebut, but not to disprove, the defendant's proffered rationale. *Griffin v. Finkbeiner*, 689 F.3d 584, 593 (6th Cir. 2012).

Defendant concedes that Plaintiff can establish the first three elements of a prima facie case as to his 2014 layoff, but cites Victoria Coleman's affidavit, attached to its Reply, in support of its argument that Crock was not similarly situated. (Doc. 23-2). Therein, Coleman, the Manager of Administrative Services in the City's Department of Human Resources, states that Plaintiff was employed by the City from 2012 to 2014 "as an Administrative Technician I, a Classified Exempt position", and Crock "was hired as a Mayor's Assistant I in the Department of Business Development, an unclassified exempt position". (Doc. 23-2, at 2). She further states

that Plaintiff and Crock both worked in the Business Development Department, never held the same position, and that Crock did not assume the position of Administrative Technician I after Plaintiff was laid off in 2014. *Id.* Thus, Defendant argues, the two are not similarly situated.

Plaintiff, on the other hand, testified that Crock took Plaintiff's position and responsibilities even though Plaintiff had a college degree and Crock did not:

> Q:    Okay. You said you were laid off. So later you also mentioned Ryan Crock. So I'm just trying to figure out how he played into this as far as racial discrimination goes. That's the example you gave me.
>
> A:    During the administration, he was asked to work with the department of development to assist, just due to the short employee staff, and I'm not sure where that got mixed up, but he end[ed] up getting put in that position. I'm not sure - - as an intern. And then they hired him on eventually full-time under the position.
>
> And I work - - our actual job specifications, I had a degree. You know, I done what he was doing. I'm not sure after the fact what his job entailed or what exactly happened under the Collins[] administration, but when we were working together, he was hired on as an intern, eventually hired full-time.
>
> Q:    Okay. So are you saying that he took the job that you should have had is my question?
>
> A:    That - - the position, yes. The position of - - and the responsibilities, yes, he took those.
>
> Q:    And you're saying that your qualifications were both the same?
>
> A:    I had a degree.
>
> Q:    Okay. And he did not have a degree?
>
> A:    No.

(Plaintiff Dep., Doc. 17-1, at 49-50). In his Affidavit, submitted with his opposition, Plaintiff further asserts that "[t]he Collins administration continued the employment of a white intern,

without a college degree and less experience to maintain my position within the department of development, later placing him on salary payroll." (Plaintiff Aff., Doc. 20-1, at 1).

The undersigned finds Plaintiff has failed to make out a prima facie case. "[A] person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work." *Barnes v. GenCorp, Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990). Rather "[a] person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties." *Id.* Defendant presents evidence that Plaintiff and Crock did not hold the same position, and Plaintiff was not "replaced" by Crock in the form of Coleman's Affidavit. (Doc. 23-2). Plaintiff attempts to presents evidence to the contrary – in the form of his own testimony and affidavit – that Crock "maintain[ed] [his] position within the department of development" (Plaintiff Aff., Doc. 20-1, at 1), and took his "position" and "responsibilities" (Plaintiff Dep., Doc. 17-1, at 50). However, at his deposition, Plaintiff admitted a lack of personal knowledge of Crock's position and duties after the change in administration. *See* Plaintiff Depo., Doc. 17-1, at 49 ("I'm not sure after the fact what his job entailed or what exactly happened under the Collins[] administration[.]"); *see also* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."). The undersigned therefore finds Plaintiff has failed to demonstrate a genuine issue of material fact as to the fourth element of his prima facie case. However, even if he had, for the reasons discussed below, summary judgment would still be appropriate.

As noted above, Defendant offered a non-discriminatory reason for Plaintiff's layoff – the change in mayoral administration, or "politics". *See* Doc. 17, at 8.

Therefore, the burden shifts back to Plaintiff to "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253. Regarding this 2014 termination, Plaintiff has submitted no evidence – other than his own belief that the termination was racially-motivated – to demonstrate that Defendant's proffered reason (politics) was pretextual. *See* Doc. 20, at 5 ("[D]espite Defendant's contentions, Plaintiff in his deposition stated that [] 'race definitely played a factor to an extent.' Plaintiff's Dep. at p. 10. He added that over time, he felt it had to do with race."); (Plaintiff Dep., Doc. 17-1, at 10-1. These subjective beliefs are insufficient to create a genuine issue of material fact regarding pretext. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 585 (6th Cir. 1992) ("conclusory allegations and subjective beliefs . . . are wholly insufficient evidence to establish a claim of discrimination as a matter of law") (collecting cases).

*2017 Termination*

As it relates to his 2017 termination, Plaintiff refers to "a [C]aucasian female who was carried on for one year before being terminated rather than having been place[d] on a last chance agreement." (Doc. 20, at 5). In support, he cites generally his Rebuttal Statement to the Ohio Civil Rights Commission. *See* Doc. 20-6. In that document, Petitioner stated: "The Respondent makes references to a 'Caucasian female' in her Probationary stage was not given a Last Chance Agreement but terminated after a year. This [c]orrelates to cause for discrimination as said Caucasian remained under employment for over [a] year despite incidents." *Id.* at 3. The document to which Plaintiff's rebuttal references states:

> Before Charging Party was terminated, he was given several opportunities to succeed. Three (3) months into his employment, Charging Party had four (4) incidences of reporting to work tardy. In order to assist this employee in completing the required amount of probationary hours, Respondent approved the extension of that probationary period. In comparison, when another situation developed that involved a Caucasian female, in her probationary stage, *this*

*courtesy was not extended.* After several incidents of reporting to work late and using numerous hours of undocumented sick time, the employee was not granted an extension of time but was terminated after a year.

(Doc. 20-2, at 4) (Defendant's statement to the OCRC) (emphasis added). Thus, it is not clear how Plaintiff contends this shows an individual who was treated more favorably than he was. And, more importantly, Plaintiff provides no further information regarding this individual to demonstrate she was "similarly situated" to Plaintiff "in all of the relevant respects". *Gragg v. Somerset Tech. Coll.*, 373 F.3d 763, 768 (6th Cir. 2004).

Moreover, even if this were sufficient to establish a prima facie case, Defendant has offered a non-discriminatory reason for Plaintiff's termination: non-compliance with work rules culminating in failure to sign a last chance agreement. *See* Doc. 17, at 6-7.

In attempting to satisfy his burden of showing a genuine issue of material fact regarding pretext Plaintiff "notes that the actions of Defendant were pretextual" because: 1) he never actually violated the CBA's provisions regarding sick time; 2) the City did not have on record a doctor's note Plaintiff provided from May 26, 2017 (*see* Doc. 20-5); 3) he was denied union representation at the Last Chance Agreement meeting; 4) he was not provided a disciplinary warning or notification regarding "lack of motivation"; 5) his attendance record shows "minimal tardies (none following the original extension of his probation in December 2016) and willingness to work overtime"; and 5) his call volume exceeded that of his peers. (Doc. 20, at 6).

In order to show pretext, a plaintiff must demonstrate that the defendant's proffered reason for taking adverse action either: (1) had no basis in fact; (2) did not actually motivate the adverse employment action; or (3) was insufficient to motivate the adverse action. *See Vincent v. Brewer Co.*, 514 F.3d 489, 497 (6th Cir.2007); *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 573 (6th Cir. 2000). Plaintiff himself admitted at his deposition that he was tardy for work and

received several notices regarding attendance issues. (Doc. 17-1, at 21). He further admitted he knew he was not meeting Defendant's expectations in this regard:

> Q:   Well, my question was did you realize that you weren't meeting the expectations by being late or tardy?
> * * *
> A:   Yes, I realized I wasn't meeting the expectations. And they gave me a probation slip for that, which I didn't sign.

*Id.* at 22; *see also id.* at 25-30 (admitting he was tardy on dates provided by Defendant).

Further, although Plaintiff disputes Defendant's reasons for attempting to place him on a Last Chance Agreement, he has not presented sufficient evidence to create a genuine issue of material fact as to whether those reasons were pretextual, or that the Defendant's reason for terminating him – his failure to sign the Last Chance Agreement – was pretextual. Although Plaintiff challenges Defendant's claim that he used excessive sick time – presenting a note from his dentist stating he had an appointment on May 26, 2017 at noon (Doc. 20-5), he presents no evidence to challenge the other three statements regarding failure to follow work rules in the Last Chance Agreement letter – the earlier tardies, the fact that "on two (2) separate occasions, you have not abided by the unit's work rules requiring you to call off at least thirty (30) minutes before your shift begins" and that "on July 13, 2017, you placed (3) calls to another department about personal matters during work hours . . . [and] [w]hen confronted by your Supervisor about the outgoing calls, you gave two conflicting statements." (Doc. 17-14). The undersigned therefore finds that Plaintiff has failed to demonstrate a genuine issue of material fact as to whether Defendant's proffered reasons for assigning the Last Chance Agreement, or reason for his ultimate termination (his failure to sign said agreement), are a pretext for racial discrimination.

*Failure to Hire*

Plaintiff also asserts racial discrimination in Defendant's failure to hire him between his 2014 termination and his 2016 hire. However, again, he fails to present evidence to establish a genuine issue of material fact.

A failure-to-hire discrimination claim is subject to the same burden shifting analysis described above. To make out a prima facie case of discrimination based on failure to hire for a vacant position, a plaintiff must show: (1) he is a member of a protected class; (2) he applied and was qualified for the position; (3) he was considered for and denied the position; and (4) another applicant with similar qualifications who was not a member of the protected class was hired for the position. *See Sutherland v. Michigan Dept. of Treasury*, 344 F.3d 603, 614 (6th Cir. 2003).

Plaintiff specifically points to Defendant's failure to hire him for a Secretary 2 position, asserting that "[a]lthough Defendant asserts that Plaintiff could not perform [that] position because of Plaintiff's issues with typing, Plaintiff testified that he had filled in in that position in the past and that he was not sure that the typing test played any part in his having been passed over." (Doc. 20, at 3). But Plaintiff admitted in his deposition that he was not given the position because he did not meet the typing requirement:

A:      I was offered a type - - a Secretary 2 position but I wasn't given - - I wasn't given the position for a typing - - you know, a typing score. * * *

Q:      Okay. And you mentioned the typing. You did not pass a typing test a couple times. I'm looking at your time line.

A:      Yeah.

Q:      So is it fair to say that typing test - - passing that typing test was important to getting the other position, the Secretary 2 position? Is that a requirement for that position?

A:      I'm assuming it's a requirement. That's why I wasn't given the position. That's what I was told.

17

* * *

Q:      . . . So you are aware that the typing test is relevant to the actual position that you were applying for, correct?

A:      The typing test? The score?

Q:      Yes. Your score.

A:      That's what - - that's what human resources judged me off of. Judged me for not giving me the position based off my typing score.

(Doc. 17-1, at 14-15). Therefore, Plaintiff has failed to demonstrate that he was qualified for the position as is required to make out a prima facie case.

And, although Plaintiff presents evidence in the form of an email stating that he was contacted regarding recall to the position of Administrative Technician I (Doc. 20-4), Defendant presents evidence (in the form of Murphy's affidavit) that the position "ultimately went unfilled by the City of Toledo." (Doc. 23-3). Indeed, as to the Secretary 2 position, the Administrative Technician I position, or any other position, Plaintiff does not present evidence that another applicant with similar qualifications who was not a member of the protected class was hired for the position. *See Sutherland*, 344 F.3d at 614. As such, his discrimination claim fails.

<u>Retaliation</u>

Plaintiff's second claim for relief alleges retaliation in violation of Ohio Revised Code § 4112.02(I). (Doc. 12, at 5). Specifically, he asserts that his 2017 firing was retaliation for filing a charge of discrimination with the EEOC and OCRC. *Id.* at 5-6. Defendant moves for summary judgment, arguing Plaintiff has failed to provide evidence of a causal connection between these actions and his termination. (Doc. 17, at 10). In opposition, Plaintiff states only: "[W]hile Plaintiff's charge of discrimination was filed some time before his discipline issues and termination occurred, Plaintiff urges the Court to consider his claim in light of a long pattern of alleged discriminatory treatment." (Doc. 20, at 7).

Ohio Revised Code § 4112.02(I) prohibits "any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section. . . ." This language mirrors again that of Title VII, which establishes civil penalties under federal law for any employer that "discriminate[s] against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter . . . ." 42 U.S.C. § 2000e–3(a). Because of these statutes' similar language and origin, Ohio courts have held that "[f]ederal law provides the applicable analysis for reviewing retaliation claims" brought under Ohio Rev. Code. § 4112.02(I). *Baker v. Buschman Co.*, 127 Ohio App. 3d 561, 568 (Ohio Ct. App. 1998) (quotation and citation omitted); *see also Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 66 Ohio St. 2d 192, 196 (Ohio 1981) ("[F]ederal case law interpreting Title VII . . . is generally applicable to cases involving alleged violations of [Ohio Rev. Code] Chapter 4112.").

An employee attempting to prove unlawful retaliation must first establish a prima facie case. *See generally McDonnell Douglas Corp.*, 411 U.S. at 802; *see also Plumbers & Steamfitters*, 66 Ohio St. 3d at 197-98 (applying *McDonnell Douglas* burden-shifting framework to a claim brought under Ohio Rev. Code Chapter 4112). Establishing a prima facie case of retaliation requires the employee to demonstrate: (1) he engaged in a protected labor activity under Ohio or federal law; (2) his engagement in protected activities was known to the defendant; (3) defendant took an employment action adverse to plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action. *Baker*, 127 Ohio App. 3d at 567-68.

Defendant asserts Plaintiff cannot establish the fourth prong of his prima facie retaliation case. The undersigned agrees. Temporal proximity may in some circumstances be "enough to

constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation", but only when "an adverse employment action occurs very close in time after an employer learns of a protected activity." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) (finding temporal proximity sufficient evidence of causation where termination occurred the same day employer learned of protected conduct). "But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Id.*; *see also Hafford v. Seidner*, 183 F.3d 506, 515 (6th Cir. 1999) (finding that temporal proximity of "two to five months" between protected conduct and adverse action is insufficient); *Cooper v. City of North Olmsted*, 795 F.2d 1265, 1272 (6th Cir. 1986) (finding that, where employer filed disciplinary notices only weeks after protected conduct and discharged plaintiff within four months of the protected conduct, temporal proximity is insufficient to support an inference of retaliation).

Here, Plaintiff filed his EEOC complaint in March 2016. (Doc. 17-4). He was not terminated until July 2017 (and, indeed, was not yet even hired for his second position with the City until September 2016). Plaintiff points to no other specific evidence to establish a causal connection between his EEOC complaint and his termination. *See Wilson v. Cleveland Clinic Found.*, 579 F. App'x 392, 400 (6th Cir. 2014) ("Therefore, approximately nine months had lapsed between the filing of the charge and the issuance of the suspension. The gap of time between the two events, standing alone, is too attenuated to sustain a causal link. Absent other evidence of retaliation, temporal proximity here is insufficient for purposes of satisfying the prima facie case.").

Further, to the extent Plaintiff asserts any retaliation from his filing of the October 2017 OCRC complaint (Doc. 17-6), this filing was made *after* Plaintiff was terminated, and thus no causal connection can be established. *See Greathouse v. Westfall*, 212 F. App'x 379, 385 (6th Cir. 2006) ("To constitute retaliation, quite sensibly, the adverse action must occur *after* the employee engages in the protected activity.") (emphasis in original).

For these reasons, the undersigned grants Defendant's motion for summary judgment on Plaintiff's retaliation claim.

## CONCLUSION

Following review, and for the reasons discussed above, the undersigned GRANTS Defendant's motion for summary judgment. (Doc. 17).

**IT IS SO ORDERED.**

 s/ James R. Knepp II
United States Magistrate Judge